## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>RIVERBEND FOODS LLC,<br><br>      Debtor. | Chapter 11<br><br>Case No. 19-24114 |

### DECLARATION OF DALTON T. EDGECOMB IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Pursuant to 28 U.S.C. § 1746, I, Dalton T. Edgecomb, hereby declare as follows under the penalty of perjury:

1.      I am the Chief Restructuring Officer ("CRO") of Riverbend Foods LLC ("Riverbend," "Company," or the "Debtor"), a limited liability company organized under the laws of the State of Delaware.  I have been the Company's CRO since May 24, 2019.

2.      As CRO, I am generally familiar with Riverbend's day-to-day operations, business affairs, and books and records.

3.      I am a Managing Partner of Winter Harbor LLC ("Winter Harbor"), a restructuring and turnaround advisory firm based in Boston, Massachusetts.  Winter Harbor specializes in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructurings.  I have over twenty years of experience working with senior management teams in the areas of financial and operational restructuring, loan workouts, and business planning.  As explained in greater detail herein, Winter Harbor was engaged by Riverbend on April 10, 2019 as a financial advisor to assist Company management with cash management, financial forecasting, and reporting and negotiations with its senior lender, PNC Bank, N.A. ("PNC").  The scope of Winter Harbor's engagement was expanded on May 24, 2019 to include and provide for my retention by the Company as its CRO.

4.      On the date hereof (the "<u>Petition Date</u>"), the Company filed its voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "<u>Court</u>").

5.      To enable the Debtor to minimize the adverse effects of the commencement of this chapter 11 case on its remaining business operations, the Debtor has requested certain relief in various applications and motions (each, a "<u>First Day Motion</u>" and collectively, the "<u>First Day Motions</u>").  The First Day Motions seek relief intended to maintain the Debtor's remaining business operations to preserve value for the Debtor, its stakeholders, and other parties in interest. Each First Day Motion is critical to the Debtor's wind down efforts.

6.      I make this declaration in support of the Company's chapter 11 petition and in support of its First Day Motions.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.  The facts set forth in this declaration are personally known to me based upon my review of the Company's books and records and upon my discussions with the Company's legacy management, and, if called as a witness, I could and would testify thereto.

## BACKGROUND

### A.  The Debtor's Business

7.      Before it ceased regular business operations on July 31, 2019, Riverbend was a manufacturer of private label and contract-manufactured canned and jarred soups, broths, gravies, sauces, and infant feeding products.  Riverbend operated in the original Heinz facility at 1080 River Avenue in Pittsburgh, Pennsylvania (the "<u>Facility</u>"), which has been in continuous operation by various companies for over 100 years.  In 2001, when Heinz began paring back its operations

in Pittsburgh, it sold the business to Del Monte Foods, Inc., which in turn sold the business to Treehouse Foods, Inc. ("Treehouse") in 2006.

8.      In 2016, Treehouse engaged an investment bank, Harris Williams & Co., and marketed the business to numerous parties, which led to the acquisition of the business by Riverbend on May 22, 2017.  Riverbend is an indirect subsidiary of Insight Equity ("Insight").

9.      In connection with the acquisition, Riverbend was formed by Insight as a Delaware limited liability company.  Riverbend is wholly owned by a holding company, Riverbend Foods Holdings LLC ("Holdings"), which is itself a Delaware limited liability company.  Riverbend is Holdings' only asset.  The Facility is owned by a separate, non-debtor affiliate, Northeast Property Holdings LLC, which leases the Facility to Riverbend.

10.      As part of the acquisition from Treehouse, Riverbend acquired a Tetra Recart production line from one of Treehouse's other business ventures.  Tetra Recart is a rather unique form of cardboard carton packaging, as it is the only cardboard carton packaging with sterilization for food particulates.  Tetra Recart is a fairly popular form of packaging in Europe, but it is not widely used in North America.  The production line acquired from Treehouse is the only production line in the United States capable of long-run, high volume production of food sold in Tetra Recart packaging.  Riverbend's original business plan was to leverage this Tetra Recart technology, which it hoped would catch on in the United States and help to drive sales of the Company's legacy products.

11.      In addition to Tetra Recart, Riverbend also packaged its products in traditional glass jars and cans.  Riverbend's customer base largely consisted of grocery chains such as Walmart and Kroger.  At its peak, Riverbend employed approximately five hundred (500) employees, the majority of whom were members of United Food & Commercial Workers International Union

3

Local 1776 (the "<u>Union</u>").  The Union and Riverbend are parties to a certain Pittsburgh Factory

Labor Contract dated March 26, 2018 (the "<u>CBA</u>").

12.     As of the Petition Date, Riverbend employed only nine (9) employees, and had

ceased regular business operations as of July 31, 2019.

### B.  Prepetition Indebtedness

13.     In connection with the acquisition from Treehouse, The Debtor and PNC Bank,

N.A. ("<u>PNC</u>") (as an agent and lender) entered into a certain Revolving Credit and Security

Agreement dated May 22, 2017 (as amended by that certain First Amendment to Revolving Credit

and Security Agreement and Forbearance Agreement, and that certain Second Amendment to

Revolving Credit and Security Agreement and Forbearance Agreement, effective as of March 31,

2019, and as may be further amended, restated, supplemented or otherwise modified from time to

time, the "<u>Loan Agreement</u>").  The Loan Agreement originally provided for up to $45 million in

maximum available borrowings.  The Debtor's obligations to PNC under the Loan Agreement are

secured by a first priority blanket lien upon all of the Debtor's assets.  The first advance made

under the Loan Agreement was made on June 8, 2017.

14.     As a result of the shut-down that occurred at the Facility on July 31, 2019 and the

corresponding layoff of the Company's unionized workforce, the Debtor anticipates that it will

likely be subject to a significant claim held by the Union for unpaid severance pay, vacation and

holiday pay, health benefits, and other unpaid obligations under the CBA.  The Company engaged

in unsuccessful effects bargaining with respect to the Facility shut down prior to the Petition Date,

but the Debtor anticipates continuing an active and constructive dialogue with the Union during

the course of the chapter 11 case regarding the amount and treatment of the Union's claims as well

as the termination of the CBA on a consensual basis.

4

15.     The Debtor also sponsors the Riverbend Foods LLC Retirement Plan (the "Plan"), a single employer defined benefit pension plan covering former employees covered under the Debtor's CBA.  The Plan is subject to the requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), as well as pertinent provisions of the Internal Revenue Code of 1986, as amended (the "Code"), governing qualified pension plans, including the minimum funding requirements of Title IV of ERISA and Sections 412 and 430 of the Code. The Plan is also subject to rules which are established and administered by the Pension Benefit Guaranty Corporation (the "PBGC").  The Debtor is currently delinquent in making required contributions to the Plan in an amount of approximately $656,000.  Five additional contributions are required for 2020.

16.     In connection with the Debtor's plant shutdown on July 31, 2019, the Debtor was required to submit a "Reportable Event" filing with the PBGC.  This filing was made on June 24, 2019.  Additional submissions have been made to the PBGC in connection with other Reportable Events occurring as the result of the Debtor's wind down process and in response to supplemental information requests of the PBGC.  The Debtor and its advisors anticipate that it will continue to work constructively with the PBGC during this chapter 11 case.

**C.  Events Leading To Chapter 11 Filing**

17.     Riverbend experienced a major setback shortly after the closing of the acquisition as it sought to implement its business plan with respect to Tetra Recart.  The Tetra Recart production line purchased from Treehouse took nearly twelve (12) months to install and make operational rather than the three (3) months that the parties planned for.  In addition, the production line also cost approximately $7.8 million to install, which is approximately three times as much money to install as was originally projected.

5

18.     As Riverbend was dealing with issues related to the Tetra Recart production line, major problems surfaced with the Hydrostatic Sterilizer (the "Hydro") at the Facility.  In the fall and summer of 2017, the Hydro suffered from a series of breakdowns resulting in lost product and unplanned downtime.   Riverbend conducted an investigation and concluded that routine preventative maintenance had not been performed and that problems identified during the original equipment manufacturer's ("OEM") annual inspections had not been addressed.   The OEM performed another inspection at Riverbend's request and identified major problems that facilitated the breakdowns, including premature wearing of the Hydro's chains, damaged radius and vertical guides, corroded and worn head shafts and bearings, and corroded and worn infeed and discharge stations.  Riverbend set out to restore the Hydro to a good operating condition to minimize future breakdowns and revive production levels.  To date, Riverbend has spent approximately $3.1 million to restore the Hydro.  These out of pocket costs and lost revenue caused by the Hydro's breakdowns had a devastating impact on Riverbend's financial position.  The OEM projects that approximately another $3.0 million of work is necessary to fully restore the Hydro to a good operating condition.

19.     Operational issues related to the Tetra Recart and Hydro occurred while sales of Riverbend's legacy products were adversely impacted by an ongoing decline of the soup and sauces industry.  Due to the adverse impact on the business of the delays and cost overruns associated with the Tetra Recart production line, the costs and business losses due to damage to the Hydro, and continued declines in Riverbend's legacy business, Riverbend began efforts to reduce costs in early 2018.  These efforts included a renegotiation of the CBA into its current form. The renegotiated CBA was expected to yield approximately $4.7 million in annual savings for Riverbend.

20.     In mid-2018, after the renegotiation of the CBA, Riverbend began exploring a refinancing that it hoped would allow it to transition into new lines of business—specifically beverages and pet food—which were seen as potentially more profitable than soups, sauces, and other existing business lines.  These efforts continued through March and April of 2019, but ultimately Riverbend was unable to raise third party financing to allow it to transition into new lines of business.  The capital requirements were too great to allow for a transition into these new product lines without such third party financing.

21.     Further, after the significant delays and cost overruns associated with making the Tetra Recart line operational, Tetra Recart failed to gain in popularity as was initially anticipated. Riverbend also began to lose major customers to competitors, which were undercutting Riverbend on costs, as well as losing customers as a result of the customers deciding to no longer stock Tetra Recart packaged products in their stores.  The failure of the Tetra Recart production line and loss of customers occurred as Riverbend's costs arising from issues with respect to the Hydro continued to have a material adverse impact on Riverbend's financial position.

22.     Riverbend's high fixed overhead costs, even accounting for the benefits of the renegotiated CBA, require that the business generate significant production volume and revenues in order to operate.  Due to the adverse effects of the failure of the Tetra Recart business line, the Hydro, and ongoing decline in the market for Riverbend's legacy products, Riverbend's volumes became too low to support the business.

23.     In late 2018, Riverbend began to fall behind on its payables, and Riverbend is now subject to dozens of lawsuits filed by its trade creditors and suppliers on account of unpaid invoices.  As summarized herein, Riverbend also sponsors the Plan for the benefit of its employees and former employees, which is underfunded.

24.    In March of 2019, Riverbend was forced to lay off a third of its work force.  By April of 2019, Riverbend owed PNC over $20 million under the Loan Agreement, and retained Winter Harbor on April 10, 2019 as a financial advisor to assist the Company with cash management, financial forecasting, and reporting and negotiations with PNC.  On May 24, 2019 Winter Harbor's scope of retention was expanded to include my services as the Company's CRO.

**D.  Wind Down Efforts**

25.    Upon its engagement, Winter Harbor began to implement various cost-cutting measures, including another significant reduction in headcount.

26.    Winter Harbor made efforts to quickly convert raw materials into inventory to allow such inventory to be liquidated.  Winter Harbor also promptly began to pursue other asset sales.

27.    Asset sales began in June of 2019, and Riverbend was able to sell its Tetra Recart production line, along with a portion of its assets related to its soup production, for aggregate proceeds of $3.945 million.  Remaining equipment used for the Company's soup production along with certain raw materials were sold in early October 2019, and Riverbend continued to liquidate its inventory throughout this period.

28.    As stated earlier in this Declaration, Riverbend ceased regular business operations on July 31, 2019.  Since that time, its remaining employees and advisors have focused on maximizing the value of Riverbend's assets for the benefit of its creditors.  As a result of these asset sales and ongoing efforts to monetize remaining inventory and accounts receivable, only $1,679,460.18 remains outstanding under the Loan Agreement as of October 17, 2019.

**E.  Chapter 11 Initiatives**

29.    In late May of 2019, Riverbend entered into an Auction Agreement with Regal Equipment Inc. (which is well known in the industry for its specialization and expertise in the

buying and selling of food processing equipment) to sell Riverbend's baby food-related assets and other miscellaneous machinery and equipment at public auction. The auction was originally intended to occur prior to the chapter 11 filing. However, given the sheer amount of litigation and threat of judgment liens looming over the Company, and given that a well-publicized bankruptcy sale free and clear of liens is viewed as an impetus to potentially increase the value of the assets at auction, Riverbend's management, in consultation with its financial and legal advisors, determined that the best way to maximize the value of the remaining assets is to cause Regal Equipment to conduct the auction within a chapter 11 process.

30.     Thus, the Debtor anticipates that this chapter 11 case will involve an expeditious sale of substantially all of its remaining assets through a Bankruptcy Court-approved auction process pursuant to section 363 of the Bankruptcy Code. The sale proceeds will be used to pay administrative expenses, satisfy Riverbend's remaining obligations under the Loan Agreement, and, to the extent funds remain, make a pro rata distribution to unsecured creditors.

## FIRST DAY MOTIONS

31.     Concurrently with the filing of its chapter 11 petition, the Debtor is filing certain applications, motions and proposed orders. The Debtor requests that the relief described below be granted, as each request constitutes a critical element in achieving the successful wind down and liquidation of the Debtor for the benefit of all parties in interest.

32.     The First Day Motions request various forms of relief and are generally designed to ensure that the Debtor experiences as little disruption in its remaining business operations as possible as a result of its filing this chapter 11 case.

33.     I have reviewed and discussed with Debtor's proposed counsel each of the First Day Motions filed contemporaneously herewith and incorporate by reference any factual

9

statements set forth in the First Day Motions.  It is my belief that the relief sought in each of the

First Day Motions is tailored to meet the Debtor's goals described above and, ultimately, will be

critical to the Debtor's ability to successfully wind down its affairs within this chapter 11 case.

34.     It is my further belief that, with respect to these First Day Motions requesting the

authority to honor pre-petition obligations, the relief requested is essential to the Debtor's chapter

11 initiatives and necessary to avoid immediate and irreparable harm to the Debtor.   Any

diminution in the Debtor's ability to maintain its remaining business operations in the ordinary

course will have an immediate and irreparable harmful effect on the value of the Debtor's estate

to the detriment of all of the Debtor's creditors, stakeholders, and other parties in interest.

### A.   Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to Use Cash Collateral and (II) Granting Adequate Protection to the Prepetition Secured Party

35.     The Debtor has filed a motion seeking authority to utilize PNC's cash collateral for

ordinary and necessary operating expenses in accordance with a preliminary operating budget (the

"Budget"), and to provide adequate protection to PNC in exchange for the Debtor's use of cash

collateral.

36.     As set forth above, the Debtor and PNC are parties to the Loan Agreement, which

provides for a maximum revolving advance of $30,000,000, of which approximately

$1,679,460.18 was outstanding as of October 22, 2019.   The Debtor's obligations to PNC under

the Loan Agreement are secured by a blanket, properly perfected, first priority lien on substantially

all of the Debtor's assets as of the Petition Date.

37.     Prior to the Petition Date, and for the reasons discussed herein which ultimately

lead to the Debtor's chapter 11 filing, the Debtor defaulted under the Loan Agreement, resulting

in the first and second amendments to the same as well as the retention of Winter Harbor and my

retention as CRO.  The Debtor remains in default under the Loan Agreement as of the Petition Date.

38.     The Debtor performed a search of the Uniform Commercial Code ("UCC") records in the counties and states in which it has its corporate headquarters and production and warehouse facilities, and, upon information and belief, PNC is the only creditor with a lien or security interest in the Debtor's cash collateral.

39.     On October 16, 2019, the Debtor's registered agent was served with notice of a writ of garnishment served on a PNC branch in Milwaukee, Wis., on October 9, 2019, in *Marchant-Schmidt, Inc. v. Riverbend Foods, LLC*, Case No. 2019CV000459 (Wis. Cir. Ct. Oct. 4, 2019), arising from a default judgment entered for Marchant-Schmidt, Inc., in Case No. 2019CV000266 (Wis. Cir. Ct. Aug. 2, 2019), *appeal pending*, Case No. 2019AP001757 (Wis. Ct. App. Sept. 12, 2019).  On October 17, 2019, the Debtor learned that PNC had frozen the funds in the Debtor's account ending in 3776 in response to the writ.  No judgment has been entered against PNC in the garnishment action.

40.     The Debtor and PNC has agreed upon the Debtor's use of cash collateral in accordance with the budget and subject to the following terms and conditions:

      a.   **Term.**  The Debtor's use of Cash Collateral shall be authorized upon entry of the Interim Order through November 4, 2019, unless extended by written agreement with PNC or by further Court order.

      b.   **Use of Cash Collateral**.  The Debtor's use of Cash Collateral shall be limited to those expenses, payments, and/or disbursements that are expressly set forth in the weekly Budget and do not exceed a 10% line-item or 5% cumulative variance without PNC's prior written consent or are otherwise permitted under the Orders; provided, however, that professional fees incurred by professionals of the Debtor or professionals of any official committee of unsecured creditors appointed in this case (the "Committee") that are retained in this chapter 11 case by separate Order of this Court (collectively, the "Estate Professionals") shall not be capped by the amounts budgeted for such professional fees in the Budget.

11

c.  **Professional Fees**.  The Debtor shall establish a segregated escrow account (the "Professional Fee Escrow") into which the Debtor shall deposit, on a weekly basis and until PNC Claims are paid and satisfied in full, Collateral proceeds in amounts equal to the amounts budgeted for professional fees for that particular week, where such funds shall be held and earmarked exclusively for payment of professional fees and expenses incurred by the Estate professionals following separate Court approval of such payments.

d.  **Prohibited Uses of Cash Collateral**.  Cash Collateral shall not be used to: (i) fund the challenge of the validity, perfection, or priority of the PNC Liens, the enforceability of the PNC Claims or the Debtor's (or any guarantor's) obligations thereunder, or any rights of PNC that may be exercised pursuant to the PNC Loan Documents; provided, however, that the Committee, if one is appointed in this case, and its professionals shall be permitted to use up to $15,000 of Cash Collateral to investigate the validity of the PNC Liens; (ii) fund any acquisitions, capital expenditures, capital leases, or similar expenditures other than those specifically set forth in the Budget.

e.  **Events of Default**.  Certain events or occurrences shall constitute events of default under the Orders (each, an "Event of Default" and collectively, the "Events of Default"), including:

   i.   any breach by Debtor of its obligations under the Orders;

   ii.  the conversion of the Debtor's case to a case under chapter 7 of the Bankruptcy Code;

   iii. the appointment of a trustee in the Debtor's case;

   iv.  the dismissal of the Debtor's case;

   v.   the commencement of any proceeding by the Debtor to challenge the PNC Liens, the PNC Claims, or PNC's actions with respect to the PNC Liens, PNC Claims, or PNC Loan Documents; and

   vi.  the entry of any order reversing, revoking, or rescinding the Orders without the express prior written consent of PNC.

f.  **Adequate Protection**.  The Debtor shall provide PNC with adequate protection (the "Adequate Protection Obligations") comprising:

   i.   (a) monthly debt service payments that would be required under the PNC Loan Documents; and (b) weekly excess cash payments to

12

PNC of any Collateral proceeds held by the Debtor exceeding the total aggregate amount sufficient to pay in full all budgeted line items provided for in the Budget, with such payments to commence upon the Debtor's accumulation of cash in an amount sufficient to pay in full all such budgeted line items provided for in the Budget, and with such payments to cease upon the payment and satisfaction in full of the PNC Claims;

ii.    payment of PNC's reasonable fees and expenses;

iii.    valid and automatically perfected replacement liens and security interests in all the Debtor's prepetition and any postpetition assets (except recoveries pursuant to 11 U.S.C. §§ 544, 547, 548, and 550) with the same force, effect, and priority PNC held immediately before the Petition Date, including those assets in which PNC would have had a valid, effective, and perfected lien or security interest were it not for 11 U.S.C. § 552(a);

iv.    to the extent permitted under the Bankruptcy Code, an allowed super-priority administrative expense claim by PNC under 11 U.S.C. § 364(c)(1) for any diminution in value of its interests in the Collateral; and

v.    the Debtor's execution of any further documents PNC reasonably requests to protect its rights and interests in the Collateral or under the PNC Loan Documents.

41.    The Debtor has an immediate and critical need to utilize the cash collateral in order to protect the value of the estate and to continue its efforts to secure the highest and best possible offers for its assets.  The cash collateral will provide the Debtor with the working capital necessary for an orderly wind-down and liquidation, which will maximize the bankruptcy estate for the benefit of creditors in accordance with the Budget.  Accordingly, the Debtor's use of cash collateral should be approved.

## B. Emergency Motion for Interim and Final Orders (I) Approving Proposed Adequate Assurance of Payment; and (II) Prohibiting Providers from Altering, Discontinuing, or Refusing Utility Service

42.    The Debtor is currently provided utility service—specifically, electricity, gas, water, sewage conveyance, telecommunications, and internet services—by the utility providers

identified on Exhibit A to the Debtor's motion (the "Utility Providers"). On average over the last 12 months, the Debtor spent approximately $335,000 per month for utility services. Since production ceased on July 31, 2019, the average monthly utility spend has dropped to approximately $200,000, of which approximately $150,000 is paid to the Pittsburgh Water and Sewer Authority (the "PWSA"). Because these Utility Providers provide essential services, any interruption in such services would prove devastating to the Debtor's ability to continue its remaining business operations by, among other things, impeding business communications, precluding critical staff from performing their duties, and risking property damage or destruction without heat in the coming months, or in the event of fire or other unforeseen emergencies. Such risks may also pose a safety hazard to the local community and surrounding buildings to the extent the Debtor is unable to adequately respond to them without the benefit of utility services.

43.      The Debtor is subject to an Agreement with the PWSA for water and sewage Services dated April 1, 2013 (the "PWSA Agreement"), which the Debtor assumed from Bay Valley Foods, LLC, the former operating entity at the Facility, when it acquired the business from Treehouse. The PWSA Agreement is a take-or-pay contract requiring the Debtor to pay a base rate of $111,387.50 per month for water and $38,671.00 per month for sewage conveyance, regardless of the actual amount used. To the extent the amount of water actually used exceeds 600,000,000 gallons per year, the Debtor is charged an additional amount per 1,000 gallons of excess water used. Sewage-conveyance rates are not subject to an excess use modification.

44.      The PWSA Agreement additionally provides for the PWSA to collect quarterly sewage-treatment payments as billing agent for the Allegheny County Sanitary Authority ("ALCOSAN") at rates determined separately by ALCOSAN and identified quarterly on PWSA

invoices to the Debtor.  Such rates average $7.01 per 1,000 gallons used, offset by any water not routed back to ALCOSAN such as clear-water drainage into the Allegheny River.

45.    The Debtor is approximately $688,208 in combined arrears to the PWSA and is currently paying $25,000 per month under informally negotiated reduced terms to avoid a shutoff.

46.    The Debtor's factory is fed by two underground ten-inch lines.  One enters a 750,000 gallon reservoir for use in food processing (the "Reservoir Line"), while the other supplies the boiler system in the power plant (the "Power Line").  The two lines cannot be completely isolated due to numerous cross connections dating to the 1950s.

47.    The PWSA Agreement was intended to supply the Facility when it was fully operational.  Since the Debtor ceased regular operations at the end of July, it has significantly reduced its water usage.

48.    While the Debtor has significantly reduced its water usage since ceasing operations on July 31, 2019, its continued use measured in the millions of gallons per month—including 6,760,000 gallons in September—is a vexing problem arising from a history of infrastructure failures giving rise to leakage.

49.    For example, in June 2017, the Power Line ruptured, revealing a five-foot crack that appeared to have been leaking for years.  In November 2017, the reservoir pump was shut down and the reservoir lost two inches of water per hour, equating to 5,200,000 gallons per month. Remediation measures, including hydraulically sealing cement tank cracks and capping equalizer lines, reduced known losses to 3,000,000 gallons per month.  In March 2018, two lines running from the reservoir ruptured, revealing holes and cracks that appeared to have been leaking for years.  In December 2018, the reservoir's cement tanks were hydraulically sealed a second time,

reducing known losses to 2,000,000 gallons per month.  In January 2019, the Power Line suffered another rupture, revealing a two-foot crack that likewise appeared to have been leaking for years.

50.    Around July 15, 2019, the Reservoir Line was shut down to provide for personnel-only usage supplied from the Power House.  This should have resulted in a few thousand gallons used per day, but the meter showed persistent average use of 200,000 gallons per day, making it apparent that there is still significant underground leakage not visible at the surface level.  With hundreds of feet of large underground piping laid seventy years ago, it is difficult to know when this issue first arose or the magnitude of any corrective action, which the Debtor is in no position to pursue.

51.    Though it continues to suffer massive leakage, the Debtor has still reduced its water usage below the amounts contemplated in the PWSA Agreement.  However, until the Debtor vacates the Facility—which it intends to do by year end—it will require water to maintain insurance coverage as well as water and sewage for personnel use.  The Debtor will seek to negotiate in good faith with the PWSA to address its unsustainable obligations under the PWSA Agreement and avoid accruing excessive administrative expenses but cannot risk losing access to the water and sewage services it needs in the interim.

52.    Accordingly, it is critically important that the utility services continue uninterrupted, as a temporary or permanent discontinuation of utility services at the Debtor's location would fundamentally undermine the Debtor's wind down efforts and, ultimately, creditor recoveries.  Therefore, it is likewise an exercise of sound business judgment for the Debtor to take measures to ensure continued service.  I further believe that the proposed form of adequate assurance of payment is reasonable in light of the facts and circumstances surrounding this case.

**C.    Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Payment of Pre-Petition Wages, Salaries, and Benefits, (II) Authorizing the**

**Maintenance of Employee Benefit Programs in the Ordinary Course of Business, and (III) Authorizing All Banks to Honor Pre-Petition Checks for Payment of Pre-Petition Wage, Salary, and Benefit Obligations**

53.    Debtor has filed a motion seeking authorization, but not direction, to pay or otherwise honor pre-petition wages, salaries, and other pre-petition obligations arising under the Employee Benefit Programs (collectively, the "Pre-Petition Wages and Benefits"), owing to the Debtor's Employees.  The Debtor further seeks authority to continue the Employee Benefit Programs in the ordinary course of business, and seeks an order of Court authorizing banks and payroll services to honor the Debtor's pre-petition checks for payment of Pre-Petition Wages and Benefits, and prohibiting banks or payroll services from placing any holds on, or attempting to reverse, any automatic transfers to Employees' accounts for Pre-Petition Wages and Benefits.

54.    The continued and uninterrupted service of the Debtor's employees is critical to the Debtor's effort to preserve the value of its remaining assets and, by extension, maximize the value of the estate for the benefit of the Debtor's creditors and other parties in interest.  The inability to pay or a delay in payment of accrued pre-petition wages and salaries would adversely impact the employees' morale, which could prove disruptive to the Debtor's business and wind down efforts. Moreover, without payment for such pre-petition wages and salaries, Debtor's employees would suffer a significant financial hardship.

55.    The Debtor's Employees are paid on a semi-monthly basis, with the most recent payroll date having occurred on October 15, 2019 and the next payroll date scheduled to occur on October 30, 2019.  The current average gross semi-monthly payroll is approximately $61,272.62. All Employees are paid through a payroll service (ADP), which in the ordinary course of business is funded by the Debtor in advance of the payroll dates and then, on the payroll dates, draws from such funds to pay the employees directly.

56.     In total, the Debtor estimates that the aggregate amount of Employees' pre-petition accrued and unpaid wages that it seeks authority to pay pursuant to this Motion is $22,693.60, and the Debtor does not seek to make payments to Employees for pre-petition accrued and unpaid wages in excess of that amount (the "Pre-Petition Wages Cap").  Pursuant to this Motion, Debtor requests authority to pay, as and when they come due, the outstanding amounts owed as of the Petition Date for accrued and unpaid wages, including withholding and payroll-service costs, subject to the Pre-Petition Wages Cap.  None of the Debtor's Employees being paid pursuant to the relief requested in this Motion are owed pre-petition wages in excess of the $13,650 cap imposed by section 507(a)(4) of the Bankruptcy Code.

57.     Additionally, certain Employees are eligible to accrue paid time off ("PTO").  The Debtor seeks authority to honor in the ordinary course of its business operations, the liabilities to its Employees that arose under its PTO policies or practices prior to the Petition Date.  The Debtor anticipates that its Employees will either utilize any accrued PTO in the ordinary course or otherwise any unused amount will be paid out upon termination of their employment.  As of the Petition Date, approximately $54,281.64 in PTO has accrued.  To the extent PTO is paid out upon termination, no individual employee will receive a payout in excess of the $13,650 statutory cap imposed by section 507(a)(4) of the Bankruptcy Code, inclusive of amounts paid for pre-petition accrued and unpaid wages.  The Debtor does not seek to pay any of its Employees amounts in excess of such statutory cap.

58.     Further, in the ordinary course of business, the Debtor reimburses certain of their Employees for reasonable and customary expenses incurred in the scope of their services to the Debtor, including those expenses related to, among other things, business travel, communications, and office supplies.  Employees must submit all expenditures in accordance with the Debtor's

18

travel and expense policy in order to qualify for reimbursement, and each request for

reimbursement is reviewed to ensure compliance.  The Debtor is currently aware of $681 in

outstanding reimburseable pre-petition expenses.  The Debtor seeks authorization to satisfy all

unpaid pre-petition reimbursable expenses and to pay any requests as and when they arise.

59.     I believe that the requested relief will allow for a smooth transition into chapter 11

by ensuring that Debtor's current level of operations is maintained as is the dedication and

confidence of its employees at a time when the cooperation of employees is most critically needed.

I believe the relief sought in the Debtor's motion is justified, reasonable and in the best interest of

the Debtor

**D.      Emergency Motion for Interim and Final Orders Authorizing Continued Use
         of Bank Accounts, Cash Management System, and Business Forms**

60.     The Debtor has filed a motion relating to (a) the continued maintenance of its

existing bank accounts, (b) the continued use of the Debtor's existing cash management system,

and (c) the continued use of its existing business forms.

61.     The Debtor maintains five (5) accounts[1] ("Bank Accounts") with PNC Bank, N.A.

("PNC"):  (1) An "Operating Account" with an account number ending in 3768; (2) a "Funding

Account" with an account number ending in 3776; (3) a "Collection Account" with an account

number ending in 3784; (4) an "HSA Account" with an account number ending in 8198; and (5)

an "Escrow Account" with an account number ending in 2000.

62.     Prior to the Petition Date, in the ordinary course of business, incoming wires and

Automated Clearing House ("ACH") transfers were and continue to be received by the Debtor into

the Collection Account, which is a lockbox account held for the benefit of PNC.  Funds collected

---

[1] The Debtor also maintains an account at Northern Trust Bank to which it historically made disbursements for purpose of funding its employee pension plan.  The Debtor does not intend to make disbursements to or otherwise utilize this account during the course of this chapter 11 case absent separate court approval.

in the Collection Account were swept by PNC and automatically applied against the Debtor's

obligations to PNC under the Credit Agreement.  Upon the Debtor's requests for draws under the

Loan Agreement, PNC funded the draws into either the Funding Account, from which the Debtor

paid its payroll obligations, or into the Operating Account, from which the Debtor issued checks

for other accounts payable.  The HSA Account is used to fund health savings account obligations.

The Escrow Account was established in connection with the acquisition of the Debtor's assets

from Treehouse, whereby the prior operating entity (Bay Valley Foods, LLC) withdrew from a

multi-employer pension plan and Riverbend Foods agreed to make contributions to such pension

plan.  The Debtor will not be depositing any additional funds into this Bank Account.

63.     The Debtor seeks to maintain its Bank Accounts and Cash Management System,

except that funds collected in the Collection Account will no longer be swept by PNC, and the

Debtor will not be requesting any further draws under the Loan Agreement.  Going forward, the

Debtor's use of the cash held in its Bank Accounts shall be governed by the orders authorizing the

Debtor's use of cash collateral.  The Debtor further anticipates using one or more accounts to

escrow professional fees per its cash collateral arrangement with PNC, and/or to collect proceeds

from buyers in connection with the closing of any Auction sales.

64.     Continuation of the Cash Management System is warranted because the Debtor, its

estate, and ultimately its creditors would be irreparably harmed by any delay that would result

from the Debtor being forced to discontinue its Cash Management System and to implement a new

system with new bank accounts and new business forms.  Opening new debtor-in-possession

accounts would disrupt Debtor's operations and would create confusion amongst its vendors and

other counterparties and threaten to strain Debtor's relationships with such parties right at the

critical time when Debtor is attempting to maximize the value of the estate, and, in turn, creditor recoveries.

65.     In addition, in the ordinary course of its business, Debtor routinely uses various business forms, including but not limited to, letterheads, purchase orders, and invoices (collectively, the "Business Forms").  The Debtor seeks permission to use and to continue to consume its existing Business Forms without alteration or change.  I believe requiring the Debtor to create and print new forms would be a burdensome and needless expense and would cause unnecessary delay and confusion with Debtor's vendors and customers, all to the detriment of the estate and its creditors.

66.     The relief sought in the Debtor's motion is reasonable and preserves value and therefore should be granted.

[remainder of page intentionally blank]

21

Pursuant to 28 U.S.C. § 1746, I swear under penalty of perjury under the laws of the United States of America that the facts, circumstances, and other matters set forth in the First Day Motions, as well as the foregoing, are true and correct to the best of my knowledge, information, and belief, with appropriate reliance on the Debtor's other officers, employees, and advisors.

Dated:  October 22, 2019

_____
Dalton T. Edgecomb
Chief Restructuring Officer
Riverbend Foods LLC